

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  35611-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JONATHAN ANDREW BENSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Jonathon Benson appeals his conviction for indecent liberties, challenging the sufficiency of the evidence to prove the element of forcible compulsion. He also contends that the prosecutor committed misconduct in closing argument by telling jurors that the victim was courageous for taking the stand and swearing an oath to tell the truth to people she had not met before.

The evidence established that the victim verbally objected to Mr. Benson's advances and then attempted without success to pull away from and push Mr. Benson away.  That is sufficient.  And while the prosecutor's unobjected-to statement about the victim's courage arguably appealed to jurors' sympathy and bordered on vouching, it was not so flagrant or ill-intentioned that it could not have been addressed by an admonition to the jury.  We affirm the conviction.

We compliment and thank both appellate counsel for their initiative in resolving

Mr. Benson's remaining assignments of error without the need for decision by this court.

FACTS AND PROCEDURAL BACKGROUND

On a late afternoon in mid-August 2016, Jonathan Benson and Julia Avon[1] crossed

paths on the Yakima Valley College Campus. Neither was a student. The presence of

both was noted and monitored by campus security officers. The security officers wanted

to make sure that Mr. Benson, who was seen drinking alcohol in an adjacent park, did not

enter the campus with alcohol. Ms. Avon was apparently using an outlet in a campus

building to charge her cell phone, which—when done by a nonstudent—violated policy.

The interaction between the two, little of which was witnessed by the campus

security officers, resulted in Mr. Benson being charged with indecent liberties by forcible

compulsion. At trial, the State relied largely on the testimony of Ms. Avon, although it

offered as corroboration evidence from the campus security officers, a responding police

officer, surveillance video, and Mr. Benson's statement following arrest.

Ms. Avon is evidently developmentally delayed, a matter we point out, as the State

did at trial,[2] because her communication was different from what one would ordinarily

---

[1] "Julia Avon" is a pseudonym.
[2] The State elicited her testimony that Ms. Avon had been a special education student and that her soccer team had participated in the Special Olympics. Apart from establishing that she had been a forward on her soccer team, it did not delve further into her abilities or any deficits.

2

expect from a 25-year-old woman—her age at the time of trial. She testified at trial that Mr. Benson, whom she did not know, approached her in the campus building where she was charging her phone. She recalled him saying that he wanted to give her a hug, and she told him it would be okay. She did not have an objection to the hug. After that, however, he kissed her on the neck, which she said was not okay, although she admits she said nothing at the time because, as she put it, "I got scared inside my body." Report of Proceedings (RP) at 115. She "told him, like, like why are you kissing me, you know?" *Id*. at 113.

She testified that he went outside and he was "going crazy, like drinking." *Id*. at 116. She testified that Mr. Benson told her to come over to him by a tree in a park on campus and she went over to him, "[a]nd then he—and then he was like grabbing me. And then I felt his dick on me. And then he turned and gave me a big old hug and I tried to—and then I tried to move it away." *Id*. Questioned in more detail about what the State would rely on as Mr. Benson's criminal conduct, Ms. Avon testified:

> Q      What did you feel?
> A      Like a dick, like his hard dick.
> Q      Okay. And just to clarify, a penis?
> A      Yeah, like a penis.
> Q      Okay. And did you notice anything about this dick?
> A      Well, he got like a boner and like when he got drunk, you
> know how guys get drunk and then and you know how they've got like a
> burner? Like they want to have sex.

Q     Do you mean a boner?

A     Yeah.

Q     Is that the same thing as an erection?

A     Right.

Q     Okay.  So, and then what was he doing when you felt the boner?

A     Like, he was moving it back and forth.

Q     And was he still hugging you?

A     And he was still hugging me.

Q     And what were you doing during the time that he was doing that?

A     He was—

Q     What were you doing during the time that he was hugging you and he had his boner on you?

A     I was like pushing him away and walking back away.

Q     Okay.  You were pushing him away?

A     Yeah.

Q     How did that go?

A     Not good.

Q     Why do you say that?

A     Because I have (indiscernible).

Q     I'm sorry?

A     I have (indiscernible).

Q     Right.  But it sounds like you were trying to push him away. Was it easy to push him away?

A     No.

Q     Okay.  Were you—did he eventually stop?

A     Yes.

Q     What made him stop?

4

    A  Then he was stopping when, like, that I was walking away. Because he was dropping the bottle on the ground and then that's why, that's the day—that's the time that he—that I walked away.

    Q  He was dropping the bottle on the ground?

    A  Yeah.

    Q  What kind of bottle?

    A  I don't know, like vodka. Like alcohol, like lemonade.

*Id.* at 117-19. Ms. Avon testified a half dozen times to trying to push Mr. Benson away or move away from him as he rubbed his erection against her.

Ms. Avon testified that Mr. Benson was "a lot taller" than she was. *Id.* at 137. Although she described herself as "like 5' 4"," *id.*, both lawyers described her in closing argument as even more petite. The prosecutor suggested she was perhaps "well under 5 feet, actually." *Id.* at 343. And defense counsel observed, "as [the prosecutor] points out, she's not 5' 4"." *Id.* at 363.

Two campus security officers testified at trial. One, Jeffrey Cornwell, had approached Mr. Benson and Ms. Avon during their first encounter in the campus building, and told them they both needed to move on. He testified that as he approached Mr. Benson and Ms. Avon, they stood "chest to chest, face past ears, hands on [Ms. Avon's] posterior, a look of surprise on the female with her hands to her sides." *Id.* at 189. He testified that Ms. Avon was not hugging Mr. Benson. Security officer Cornwell said Mr. Benson was slurring his words and was a "little wobbly on his feet"; he opined that Mr. Benson was "definitely over the legal limit if he was operating a motor vehicle."

5

*Id.* at 192-93. Security officer Cornwell testified that both Mr. Benson and Ms. Avon were cooperative and left the campus building, but that Ms. Avon returned and asked "if she could leave out another exit and to please make sure [Mr. Benson] did not follow her." *Id.* at 193.

A second campus security officer testified that having learned that Ms. Avon was trying to get off campus and avoid Mr. Benson, he allowed her to use a phone. He also approached a Yakima police officer who was near the campus and later escorted Ms. Avon to where the officer, Bradley Althauser, had detained Mr. Benson, so that she could make an identification and tell the officer what had happened.

Officer Althauser arrested Mr. Benson for indecent liberties and took him to the Yakima police station, where he questioned him after reading him his *Miranda*[3] rights. Mr. Benson admitted hugging Ms. Avon and "maybe" touching her butt. *Id.* at 254. Asked why, he answered, "I was pretty buzzing." *Id.* Further interrogation addressed Ms. Avon's allegation that he had rubbed his erect penis against her:

> OFFICER ALTHAUSER: . . . Did you hump the front of her leg— like dry hump her?
> MR. BENSON: Maybe, I don't know.
> OFFICER ALTHAUSER: Maybe? Do you remember if you did?
> MR. BENSON: Maybe.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

> OFFICER ALTHAUSER: Maybe?  Do you remember doing it at all?
>
> MR. BENSON: No.  (Indiscernible), no.
>
> OFFICER ALTHAUSER: Oh, really?  But you think maybe you did?
>
> MR. BENSON: If I did, I'm sorry.  I apologize to her.

*Id*. at 255-56.

The jury was instructed that, to convict Mr. Benson of the crime of indecent liberties, the State must prove beyond a reasonable doubt, among other things,

> (1) That on or about August[ ] 15, 2016 the defendant knowingly caused J.A. to have sexual contact with the defendant[, and]
> (2) That this sexual contact occurred by forcible compulsion.

Clerk's Papers (CP) at 233.  It was instructed that "[f]orcible compulsion means physical force that overcomes resistance." [4]  *Id*. at 235.

In closing argument, the prosecutor addressed, without objection by the defense, the fact that Ms. Avon "is a little different than the rest of us." *Id*. at 336.  After discussing why jurors should not discount her testimony because of those differences, he stated:

---

[4] RCW 9A.44.010(6) has a longer definition of forcible compulsion:  "'Forcible compulsion' means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped."

Mr. Benson points out in his briefing that the instruction at trial provided jurors with only the first meaning but he does not assign error to the instruction, nor could he, having failed to object to the instruction at trial.

> But, you know, she did—was able to and had the courage to take the stand, swear an oath to tell the truth in front of all these people that she's never met before with the person that she says did all this in the room and tell you that that was something that happened.

*Id.* at 343.

The jury found Mr. Benson guilty as charged. He appeals.

ANALYSIS

Mr. Benson challenges the sufficiency of the evidence to prove the element of forcible compulsion and argues that the prosecutor's closing argument about Ms. Avon's courage was improper, as vouching or as appealing to the passion of the jury.

I.    SUFFICIENCY OF THE EVIDENCE

In reviewing a challenge to the sufficiency of the evidence to convict, we view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt. *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007); *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences from it. *Salinas*, 119 Wn.2d at 201. We defer to the trier of fact "on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn. 2d 821, 874-75, 83 P.3d 970 (2004), *aff'd*, 166 Wn.2d 380, 208 P.3d 1107 (2009).

Forcible compulsion, being "'physical force which overcomes resistance,'" requires more physical impact than the impact inherent in the sexual contact. *State v. Ritola*, 63 Wn. App. 252, 254, 817 P.2d 1390 (1991) (quoting RCW 9A.44.010(6)). Mr. Benson likens his case to that in *Ritola*, in which this court held that indecent liberties was not proved when the defendant reached out and squeezed the breast of a female juvenile detention counselor. But in that case there *was* no resistance—the counselor "had no time to resist." *Id.* at 255.

In this case, Ms. Avon testified that she resisted by trying to push Mr. Benson away or pull away, but he continued to hug her. The evidence was sufficient for reasonable jurors to find that his continuing to hold her close constituted forcible compulsion.

II.     PROSECUTORIAL MISCONDUCT

Mr. Benson argues it was prosecutorial misconduct for the prosecutor to tell the jury in his closing argument that Ms. Avon was courageous to testify. Mr. Benson argues the prosecutor's statement amounted to improper vouching and that the State encouraged the jury to render a verdict based on sympathy rather than on the evidence at trial.

Prosecutorial misconduct is not attorney misconduct in the sense of violating rules of professional conduct. *State v. Fisher*, 165 Wn.2d 727, 740 n.1, 202 P.3d 937 (2009). It is, instead, a term of art that refers to "prosecutorial mistakes or actions [that] are not harmless and deny a defendant [a] fair trial." *Id*. To succeed on a prosecutorial

misconduct claim, an appellant has the burden of establishing that the prosecutor's conduct was improper (as being at least mistaken) and was prejudicial. *State v. Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997). Where, as here, a defendant fails to object in the trial court to a prosecutor's statements, he waives his right to raise a challenge on appeal unless the remark was so flagrant and ill-intentioned that it evinced an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *Id.* at 719.

It is improper for a prosecutor to personally vouch for or against a witness's credibility. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). In addition, a prosecutor must seek convictions based on probative evidence and sound reason; he or she may not use arguments calculated to inflame the passions or prejudices of the jury. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).

The State argues that read in context the prosecutor was merely trying to ask jurors not to "look down on the facts [Ms. Avon] was imparting" simply because she expressed them differently than other 25-year-old women would. Br. of Resp't at 19. But the prosecutor was able to address that legitimate issue in closing before he spoke of her as courageous and as having taken an oath to tell the truth. Before the argument that is challenged, the prosecutor had already told jurors that [Ms. Avon's] differences were

> important for me to deal with because of the fact that when someone communicates with you, they send you all kinds of little messages on a subconscious basis, right? . . .

And we also talked about the fact that we have to be careful about these cues though because sometimes they can mean different things. Someone could be nervous just because they're shy and they're talking in a big courtroom or they could be nervous because they're not telling the truth. You know, they might look you in the eyes because they know that the best way to make someone believe them, whether they're telling the truth or not, is to look someone straight in the eyes. On the other hand, someone might look down because they're shy, it's a cultural thing, a variety of different things.

But, you know, [Julia] says some of her words kind of differently and we'll talk about that. She just communicates a little bit differently and evaluating her testimony is going to be important . . . .

RP at 337.

Later, talking to jurors about the way Ms. Avon said the word "hard," the

prosecutor said,

There was a vowel missing there and another consonant that's not in when most people say it, but that's [Julia] and her style of communication. Does it mean she's not telling the truth? No, it just means—I would argue to you that she communicates a little differently than most of us do.

*Id.* at 343.

At issue is whether it was misconduct for the prosecutor to go further, and say:

But, you know, she did—was able to and had the courage to take the stand, swear an oath to tell the truth in front of all these people that she's never met before with the person that she says did all this in the room and tell you that that was something that happened.

*Id*.

Mr. Benson makes a legitimate argument that singling out a single witness in this

fashion—the victim, a developmentally delayed witness—was an appeal to the jury's

sympathy and bordered on vouching. But it was a single statement, and in context cannot

11

reasonably be construed as flagrant or ill-intentioned. It could easily have been addressed by an admonition to the jury.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.
_____
Siddoway, J.

WE CONCUR:

Fearing, J.
_____
Fearing, J.

Korsmo, J.
_____
Korsmo, J.